**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CONOCOPHILLIPS PETROZUATA B.V., PHILLIPS PETROLEUM COMPANY VENEZUELA LIMITED, CONOCOPHILLIPS GULF OF PARIA B.V. and CONOCOPHILLIPS HAMACA B.V., <br><br> Plaintiffs, <br><br> v. <br><br> PETRÓLEOS DE VENEZUELA S.A., PDV HOLDING, INC., CITGO HOLDING, INC. and CITGO PETROLEUM CORPORATION, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) C.A. No. _____ ) ) ) ) ) ) ) ) |

## COMPLAINT

Plaintiffs ConocoPhillips Petrozuata B.V., Phillips Petroleum Company Venezuela Limited, ConocoPhillips Gulf of Paria B.V. and ConocoPhillips Hamaca B.V. (altogether "ConocoPhillips"), by their undersigned attorneys, and as for their Complaint against Defendants Petróleos de Venezuela, S.A. ("PDVSA"), PDV Holding, Inc., CITGO Holding, Inc. and CITGO Petroleum Corporation, allege a cause of action for fraudulent transfers as follows:

## Background

1.      The Bolivarian Republic of Venezuela ("Venezuela") confiscated and nationalized the Plaintiffs' interests in major projects in the Orinoco Oil Belt worth billions of dollars.  Having not received any compensation, ConocoPhillips brought three of the largest arbitration claims ever against both Venezuela and its state-owned oil company, PDVSA.  The liability for the expropriation is not subject to any serious doubt; indeed, Venezuela has been

adjudged liable and has even admitted that it owes compensation to ConocoPhillips (yet no payment is forthcoming).   And PDVSA has only weakly contested its own liability.   As described below, Plaintiffs bring this action because the Defendants have undertaken to fraudulently transfer, remove and/or encumber assets that could otherwise be subject to collection on eventual judgments confirming those arbitration awards.

2.      The Plaintiffs were critical to opening one of the largest oil reserves in the world, Venezuela's Orinoco Oil Belt.  Lacking the technology and financing needed to commercialize the Orinoco Belt hydrocarbons on its own, in the 1990s Venezuela sought out and invited independent oil companies to enter into long-term joint ventures with PDVSA.  After a decade of work and after investing billions of US dollars, the Plaintiffs succeeded in bringing the two major Orinoco oil projects, Petrozuata and Hamaca, online, and were preparing to launch a third project called Corocoro.

3.      In 2007, for political reasons and financial gain, Venezuela expropriated and nationalized those assets in a series of interconnected actions that began in 2004.  Because ConocoPhillips did not receive any compensation—and still has not—ConocoPhillips instituted an arbitration before the World Bank's International Center for Settlement of Investment Disputes ("ICSID") against Venezuela pursuant to the Netherlands-Venezuela Bilateral Investment Treaty (the "BIT").

4.      Although the above action is by far the largest case against it, Venezuela faces more than 20 other arbitration cases over harmful nationalizations carried out by Venezuela during the rule of the late President, Hugo Chávez.  Venezuela's arbitration liabilities in these other cases could exceed US $10 billion.

5.      In 2014, the Plaintiffs also commenced contractual arbitration under the rules of

the International Chamber of Commerce ("ICC") against PDVSA and two of its subsidiaries for damages and contractual indemnities arising under the Petrozuata and Hamaca project agreements.  Under those agreements, PDVSA is obligated to pay prescribed indemnities to the claimants for discriminatory measures by Venezuela, and is also responsible to compensate the Plaintiffs fully for its role in taking the entire value of the Petrozuata and Hamaca projects.

6.     Venezuela has rejected its obligations under its commercial and international agreements, has flouted the rule of law and chafes under its international treaties, including with respect to its obligations to ConocoPhillips.  Venezuela has done everything possible to delay these arbitrations and any eventual enforcement.  Venezuela has even stated publicly that it does not intend to satisfy the existing and anticipated awards entered against it, including those in favor of ConocoPhillips.  For example, as the late President Chávez made clear in 2012, referring to the Exxon Mobil ICSID arbitration:  "They are trying the impossible: to get us to pay them . . . We are not going to pay them anything."

7.     The Defendants' most valuable assets in the United States are their interests in CITGO Petroleum Corporation and affiliates, held through CITGO Holding, Inc. (altogether, "CITGO").  Through CITGO, the Defendants own, among other things, interests in petroleum refineries, blending plants and numerous terminals and pipelines located within the United States (the "CITGO Assets").  According to a July 2014 bond offering, the value of CITGO was about US $8.1 billion (as of the end of 2013).

8.     In September 2013, the ICSID tribunal ruled that Venezuela's expropriation of ConocoPhillips's assets was unlawful and proceeded to set a schedule to fix the amount of compensation due.  Shortly thereafter, the Defendants undertook an ongoing campaign to liquidate assets and repatriate the proceeds to Venezuela for the stated purpose of placing them

out of the reach of the Plaintiffs and other arbitration award creditors.

9.      First, the Defendants attempted to sell CITGO in 2014.  PDVSA and Venezuelan government officials have reportedly stated that PDVSA's intention for selling CITGO was to hinder enforcement of the arbitration awards.  For example, it was reported that government officials stated that the "decision to sell Citgo [was] also motivated by concerns in Caracas that two arbitration panels at the World Bank's International Center for Settlement of Investment Disputes (ICSID) likely will issue rulings soon ordering [PDVSA] to compensate ConocoPhillips and Exxon Mobil for their stakes in Venezuelan integrated Orinoco assets that were nationalized in 2007."  The effort to sell CITGO outright failed.

10.      Second, in February 2015, the Defendants instead liquidated a substantial portion of their interests in CITGO through a complicated debt offering and special dividends.  By that transaction, the Defendants raised US $2.8 billion from CITGO and sent virtually all of the proceeds to Venezuela.  The new debt is backed by equity pledges, guarantees and security interests given in relation to the CITGO Assets.  As a result, CITGO reportedly has at least US $5 billion in debt on a consolidated basis, leaving the Defendants with only approximately US $3 billion in owners' equity of CITGO.

11.      Third, the Defendants are reportedly further depleting and transferring interests in the CITGO Assets by using CITGO as a procurement and payment agent to pay off certain of PDVSA's commercial debts.  For example, on September 13, 2016, *Reuters* reported that PDVSA caused CITGO to pay British Petroleum ("BP") at least US $43.7 million to satisfy two invoices on a tender between PDVSA and BP.

12.      Indeed, upon information and belief, PDVSA has often used CITGO as a procurement and payment agent on numerous purchases of everything from airplanes to power

generators and spare mechanical parts for vessels.  For many years, PDVSA did not even attempt to compensate CITGO in any way for its purchases on behalf of PDVSA.   More recently, upon information and belief, the Defendants have begun to style this procurement activity as "non-cash dividends," confirming that these transactions involve the transfer of PDVSA's property.

13.   <u>Fourth</u>, the Defendants are currently attempting to extract and remove the remaining value from their interests in the CITGO Assets.  On September 16, 2016, PDVSA announced an offer to exchange approximately US $7 billion of its obligations due in 2017 for new notes maturing in 2020.  In exchange, PDVSA offered to give 50.1% of its interests in CITGO as collateral.  Since PDVSA owns CITGO through PDV Holding, Inc., and CITGO Holding, Inc., PDVSA is causing PDV Holding, Inc. to pledge its equity in CITGO Holding, Inc. Standard & Poor's has characterized the swap on offer as a "distressed exchange" that would be "tantamount to default."  As described below, following the initial market reaction to the offer, the Defendants have reduced the offer to swap US $7 billion in bonds to about US $5.3 billion in new bonds.

14.   The purpose behind each of these transfers is the same:  to remove assets from the United States to Venezuela and/or to encumber assets in the United States, with the intent to hinder, delay or defraud PDVSA's and Venezuela's arbitration award creditors, including ConocoPhillips.

15.   Plaintiffs bring this action under the Delaware Uniform Fraudulent Transfer Act, 6 *Del. C.* § 1301 *et seq*. ("DUFTA").  DUFTA makes it unlawful to transfer assets "with actual intent to hinder, delay or defraud any creditor of the debtor."   DUFTA provides for remedies including, among others, the avoidance of transfers or obligations, injunctions against further disposition, and the appointment of a receiver to take charge of assets transferred.

## Parties

16.     Plaintiff ConocoPhillips Petrozuata B.V. ("ConocoPetrozuata") is a subsidiary of ConocoPhillips Company.  ConocoPetrozuata is a Dutch company having its registered office at New Babylon Gardens, Anna van Buerenplein 41, 2595 DA, Den Haag, Netherlands.

17.     Plaintiff ConocoPhillips Hamaca B.V. ("ConocoHamaca") is a subsidiary of ConocoPhillips Company.  ConocoHamaca is a Dutch company having its registered office at New Babylon Gardens, Anna van Buerenplein 41, 2595 DA, Den Haag, Netherlands.

18.     Plaintiff Phillips Petroleum Company Venezuela Limited ("ConocoVenezuela") is a subsidiary of ConocoHamaca.  ConocoVenezuela is a Bermuda company having its registered office c/o ConocoPhillips Company, 600 North Dairy Ashford, Houston, Texas, 77079.

19.     Plaintiff ConocoPhillips Gulf of Paria B.V. ("ConocoGulf") is a subsidiary of ConocoPhillips Company.  ConocoGulf is a Dutch company having its registered office at New Babylon Gardens, Anna van Buerenplein 41, 2595 DA, Den Haag, Netherlands.

20.     Defendant Petróleos de Venezuela, S.A. ("PDVSA") is Venezuela's national oil company, wholly owned by the Bolivarian Republic of Venezuela and headquartered in Caracas, Venezuela.

21.     Defendant PDV Holding, Inc. ("PDV Holding") is a Delaware corporation with its registered office at 1209 Orange Street, Wilmington, Delaware, 19801.  PDV Holding wholly owns CITGO through CITGO Holding, Inc.

22.     Defendant CITGO Holding, Inc. ("CITGO Holding") is a Delaware corporation with its registered office at 1209 Orange Street, Wilmington, Delaware, 19801.  CITGO Holding wholly owns CITGO Petroleum Corporation.

23.     Defendant CITGO Petroleum Corporation is a Delaware corporation with its registered office at 1209 Orange Street, Wilmington, Delaware, 19801.

## Jurisdiction and Venue

24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1330 and 28 U.S.C. § 1367.   PDVSA is an agency or instrumentality of a foreign state within the meaning of 28 U.S.C. § 1603 and PDVSA is not entitled to immunity from subject-matter jurisdiction of this Court under 28 U.S.C. § 1605.

25.     This Court has personal jurisdiction over PDVSA pursuant to 28 U.S.C § 1330(b).

26.     This Court has personal jurisdiction over PDV Holding, CITGO Holding and CITGO Petroleum Corporation pursuant to *8 Del. C.* § 321(a), 10 *Del. C.* § 3111, and Federal Rule of Civil Procedure 4(k).

27.     Venue is proper in this judicial district because Defendant PDV Holding, CITGO Holding and CITGO Petroleum Corporation reside in this District and because a substantial part of the events or omissions giving rise to this action occurred in this District.

## The Pending Awards

28.     After a full hearing on the merits, on September 3, 2013 the ICSID tribunal ruled that Venezuela violated the BIT by illegally expropriating the assets held by ConocoPetrozuata, ConocoHamaca and ConocoGulf.   The tribunal did not determine the quantum of damages at that time and proceedings are ongoing to quantify that amount, which the ICSID claimants assert is multiple billions of dollars.   Although Venezuela continues to dispute the illegality of the nationalization, it has conceded that it owes compensation to the Plaintiffs.

29.     Separate from the ICSID arbitration, Plaintiffs ConocoPetrozuata and ConocoVenezuela are each claimants in two consolidated International Chamber of Commerce

arbitrations against PDVSA and two of its subsidiaries (the "ICC Arbitrations").  Pursuant to contracts governing the Plaintiffs' respective investments in the Petrozuata and Hamaca projects, PDVSA is obligated to partially indemnify ConocoPetrozuata and ConocoVenezuela for expropriation and other discriminatory measures by Venezuela.  In addition to this contractual indemnity claim, the ICC claimants seek to hold PDVSA liable for its active and collusive role in bringing about the expropriation, from which it has directly profited.  This latter claim is for the value of the Petrozuata and Hamaca projects.

30.     ConocoPetrozuata and ConocoVenezuela commenced their ICC Arbitrations on October 10, 2014.  Those arbitrations are fully briefed, and a final hearing on liability and quantum will be completed by December 10, 2016.

31.     As mentioned above, Venezuela faces more than 20 other arbitration cases regarding nationalizations carried out during the rule of the late President, Hugo Chávez.  In 2015, Credit Suisse estimated the potential liabilities from these other cases at ICSID could reach approximately US $10 billion, excluding those cases brought by the Plaintiffs.  Since then, additional cases have been brought and a number of quantum awards have been rendered (and others still pending) against Venezuela by ICSID tribunals.

32.     The value of Plaintiffs' claims before ICSID and in the ICC Arbitrations dwarfs those other arbitration cases, including the US $1.6 billion awarded to Exxon Mobil's affiliates, and are among the largest arbitration claims ever brought.

33.     Disregarding international law, Venezuela has publicly vowed it will refuse to pay the arbitral awards.  As discussed above, for example, in a televised speech on January 8, 2012, the late President Hugo Chávez vowed that Venezuela would not recognize arbitration awards of the types pursued by Plaintiffs.  Chávez stated, referring to Exxon Mobil and other expropriation

claimants:  "They are trying the impossible: to get us to pay them . . . We are not going to pay them anything."

34.     Shortly after the 2013 ICSID decision in favor of ConocoPhillips, the Defendants have engaged in a series of actions designed to prevent collection in the United States.   In addition to the effort to liquidate, encumber and expatriate the CITGO Assets, Venezuela is also actively resisting enforcement in numerous legal forums throughout the United States. Venezuela has consistently stalled enforcement or ultimate payment of awards and has refused to post security.  Venezuela has done the same in the various arbitral tribunals for which it has appeared.  For example, Venezuela first announced an intention to comply with award issued to ExxonMobil, and then sought to annul the award.  In the ICSID case brought by ConocoPhillips alone, Venezuela has made six separate challenges to the panel and has successfully delayed proceedings for years by bringing vexatious motions seriatim.

**The Defendants Attempted to Sell CITGO**

35.     In a July 2014 bond offering, CITGO disclosed that, as of the end of 2013, CITGO's book value was US $8.096 billion.

36.     Aware that CITGO was vulnerable to execution in the United States, the Defendants developed a plan to convert CITGO assets—mostly hard assets such as refineries, lubrication plants, pipeline, retail stations and the like—to cash, and then move that cash out of the United States to Venezuela, in order to shield it from creditors like Plaintiffs.  Defendants' first attempt to implement that plan was to simply sell CITGO outright.

37.     The CITGO Assets represent a material portion of PDVSA's property, and all of PDV Holding's property.  According to that bond offering and PDVSA's financial statements, the revenue attributed to CITGO represented about 31.5% of all of PDVSA's consolidated

revenue for the year ending December 31, 2013 (US $42.254 billion of US $134.326 billion). According to those same documents, the CITGO Assets represented about 26.5% of PDVSA's total refining capacity at year end 2013 (749 thousand barrels per day of 2,822 thousand barrels per day).

38.      In 2014, PDVSA announced its intention to sell CITGO (which it owns through PDV Holding).  In a July 2014 bond offering, CITGO confirmed that PDVSA was "seeking to monetize its ownership interest in [CITGO]" by the sale.  PDVSA could then remove the proceeds from the United States.  CITGO explained:  "PDVSA may pursue transactions or other opportunities that could involve risks to our creditors. In the past PDVSA has explored strategic alternatives relating to CITGO and it is currently seeking to monetize its ownership interest in us."

39.      Defendants themselves stated that their intent in selling CITGO was to shield its assets from collection by its arbitration award creditors like Plaintiffs.  According to media reports, PDVSA and Venezuelan government officials stated that PDVSA's intention for selling CITGO was to hinder enforcement of the arbitration awards.  For example, in an article appearing on July 24, 2014 and citing "energy ministry officials," *Argus* reported that "[t]he government has received three separate offers to buy Citgo submitted through Goldman Sachs, JP Morgan and Deutsche Bank" and that "[m]inistry officials said the decision to sell Citgo is also motivated by concerns in Caracas that two arbitration panels at the World Bank's International Center for Settlement of Investment Disputes (ICSID) likely will issue rulings soon ordering [PDVSA] to compensate ConocoPhillips and Exxon Mobil for their stakes in Venezuelan integrated Orinoco assets that were nationalized in 2007." *Argus* further reported that "Venezuela's government is concerned that an ICSID ruling ordering [PDVSA] to pay

compensation to the US companies could be followed by US court litigation resulting in attachments and liens on Citgo assets in the US, the ministry officials said."

40.     In an August 10, 2014 *Press TV* video news clip, it was reported that "[t]he [Venezuelan] government says selling Citgo will protect oil assets from being seized by arbitration and international trials that are currently developing in America."

41.     On July 25, 2014, *Argus* published an article citing "Venezuelan officials" and reporting that PDVSA "is weighing offers in the range of $10bn-$15bn to buy its downstream subsidiary Citgo" and that "[t]he planned sale of Citgo is aimed at raising cash for upstream projects at home, redirecting more crude supply to China in exchange for oil-backed loans, and reducing the government's potential exposure to international litigation."

42.     In a July 30, 2014 article, citing Russ Dallen, head of Caracas Capital Markets, the *Wall Street Journal* reported that "Venezuela is looking under couch cushions for coins because they need money . . . . [t]he Exxon and ConocoPhillips judgments are coming any day now and the easiest place to enforce those judgment will be the United States."  Citing Anthony Szabo (founder of an oil-oriented consulting company and president of Stone Bond Technologies in Houston), the article further reported that PDVSA is "going to lose the arbitration hearings . . . . [t]hey'll lose, so these assets can be frozen."

43.     In a July 31, 2014 article, citing GlobalSource Partners' Ruth Krivoy and Tamara Herrera, *Bloomberg* reported that "[t]he government of President Nicolas Maduro probably is looking to sell offshore refineries to boost hydrocarbon exports to China, raise cash and reduce the risk of having assets seized as part of [PDVSA] lawsuits abroad."

44.     *Reuters* ran an article on September 24, 2014 citing "analysts," "industry players," and "industry experts" and reporting that PDVSA's "rushed move to sell units raises questions

whether Venezuela wants to reduce international exposure to avoid potential asset grabs in the event companies win arbitration cases against the country" (referring to "Citgo Petroleum Corp, as well as stakes in the Hovensa refinery in the U.S. Virgin Islands, the Chalmette refinery in Louisiana, and a network of refineries in Sweden, England and Scotland").  The article reported that Venezuela "has shrouded the potential deals in secrecy, leaving analysts and industry players scrambling to piece together a rationale for the surprise divestment" and that "industry experts also point out [PDVSA] may be keen to reduce its international exposure ahead of Exxon Mobil Corp and ConocoPhillips arbitration decisions due in coming months."  Citing Carlos Bellorin, an industry analyst, the article further reported that "[t]he companies that have arbitrations against Venezuela have always seen the CITGO assets as a guarantee should a hypothetical award need to be forcefully executed . . . ."

45.     Ultimately, PDVSA was unable to find a buyer for CITGO, and it terminated the sale process in late 2014.  But Venezuela's stated goal of putting CITGO's Assets out of reach of its arbitration claimants remained and soon Defendants developed an alternative plan to transfer its assets out of the U.S. before those assets could be seized by Defendants' creditors.

## The Defendants Transferred ~US $ 2.8 Billion

46.     After the Defendants were unable to sell all of CITGO, they decided instead to (a) sell CITGO debt and pledge CITGO Assets to effectively liquidate US $2.8 billion worth of CITGO Assets; (b) cause CITGO Holding (Delaware) to pay almost all of the proceeds as a special dividend up to PDV Holding (Delaware); and (c) cause PDV Holding (Delaware) to pay those proceeds as another special dividend up to PDVSA in Venezuela.

47.     By the transaction completed in February 2015, CITGO Holding raised US $2.8 billion through US $1.5 billion worth of high-yield bonds with a five-year maturity and a US

$1.3 billion three-and-a-half year term loan.  Venezuela pledged CITGO Assets and equity as security and the interest rate on the loan and the yield on the bonds are both north of 10%.

48.     There was no commercial purpose for the transaction other than to extract and transfer the proceeds up the ownership chain and out of the United States off to Venezuela. After CITGO Holding raised the US $2.8 billion, PDV Holding caused CITGO Holding to pay PDV Holding virtually all of the proceeds from the transaction, apparently in exchange for nothing.  Then PDVSA caused PDV Holding to pay PDVSA those proceeds, again, apparently in exchange for nothing.  Upon information and belief, PDVSA then handed the proceeds over to Venezuela.

49.     As a result of this transaction and other events, CITGO now has about US $5 billion in debt on a consolidated basis, leaving the Defendants and its unsecured creditors with only approximately US $3 billion in owner's equity (based upon an enterprise valuation of around US $8 billion for CITGO) available to satisfy their arbitration awards.  Meanwhile, nearly US $2.8 billion in "dividends" was transferred to Defendants' coffers outside the U.S. (and thus outside the practical reach of Defendants' creditors).

50.     Defendants intended this transfer to hinder or delay creditors, including Plaintiffs. The offering documents confirm and further illustrate the control PDVSA and Venezuela exerted over CITGO.

51.     Further, tellingly, the Defendants themselves anticipated the possibility of this transaction being challenged as a fraudulent transfer.  The offering documentation for the deal warned would-be investors the transaction might be challenged as a fraudulent transfer and confirmed that Venezuela was using PDVSA to orchestrate the transaction at the expense of CITGO.  The offering document contains the following disclosures:

i.  "[N]o assurance can be given that any of the Transactions would not be challenged as a fraudulent transfer;"

ii.  "In connection with the arbitrations against PDVSA and [Venezuela], the claimants may seek to freeze or attach [CITGO Holding's] assets and/or assets of PDVSA, [PDV Holding] and/or CITGO;"

iii.  "[No] assurance [could] be given that . . . Venezuela, as PDVSA's shareholder, will not adopt policies or exercise its control of PDVSA in a manner that might adversely affect [CITGO Holding bondholders'] interests;" and

iv.  "PDVSA could at any time in the future conduct other processes or undertake one or more transactions to monetize its interests in [CITGO], and any such process could be undertaken or any such transaction could occur at a time when it would be beneficial to PDVSA but could have a negative impact on [CITGO Holding]."

52.     These statements echo earlier statements in a CITGO July 2014 bond offering, in which CITGO warned that "PDVSA may pursue transactions or other opportunities that could involve risk to our creditors."  In other words, PDVSA might take actions to liquidate and expatriate assets, solely for its own benefit, and at direct risk to PDVSA's creditors in the United States.

53.     Once issued, the ratings agencies immediately deemed the bonds non-investment grade—"junk"—by the ratings agencies.  They began to trade below par.

**The Defendants Use CITGO to Pay PDVSA's Commercial Debts**

54.     PDVSA controls and dominates CITGO.  Indeed, each member of CITGO Holding's, Inc.'s and CITGO Petroleum's boards of directors have a direct connection—if not

direct overlap—with PDVSA, and numerous directors and officers of PDV Holding and CITGO are intimately connected to PDVSA as well.

55.     Most tellingly, PDVSA is now reportedly using CITGO as its procurement and accounts payable agent, using CITGO to pay PDVSA's own commercial debts.   Upon information and belief, PDVSA has for many years used CITGO as a procurement arm of PDVSA.

56.     Most recently, according to *Reuters*, earlier this year PDVSA awarded British Petroleum Plc. ("BP") a large tender for the supply of light crude deliveries to PDVSA.  PDVSA was to pre-pay for shipments of 7.4 million barrels during the second quarter of 2016, but payments were delayed.   The delay reportedly allowed BP to increase the prices from the original agreement and caused PDVSA to incur demurrage costs because it was not able to take deliveries.   According to *Reuters*, "[t]he total price tag for the BP tender rose 57 percent due to the delays to an average of $49 a barrel through August [2016] from the $31.21 planned in March [2016], invoices and internal documents show."  PDVSA then reportedly caused CITGO to begin paying on the BP invoices.  *Reuters* reporters state they had access to copies of "bank transfer vouchers" in relation to payments by CITGO to BP on at least two PDVSA invoices totaling US $43.7 million.

57.     Upon information and belief, PDVSA has used CITGO as a procurement and paying agent on numerous purchases, including airplanes, power generators and mechanical parts for vessels.  For many years, upon information and belief, PDVSA did not even try to compensate CITGO in any way for these purchases because, upon information and belief, PDVSA regarded and deployed CITGO Assets as its own.   As mentioned above, upon

information and belief, the Defendants have begun to style this procurement activity as "non-cash dividends," confirming that these transactions involve the transfer of PDVSA's property.

### The Defendants Seek to Further Leverage Ownership of CITGO

58.    Defendants were not finished with their efforts to "cash out" their CITGO interests and relocate that value to Venezuela.  PDVSA has recently proposed a new US $5.325 billion bond swap (initially priced at about US $7 billion).  PDVSA is attempting to push off maturity and debt service payments due before the end of 2017 until 2020.

59.    This new debt will be backed by a 50.1% stake in CITGO, in the form of a pledge of a first priority lien on 50.1% of PDV Holding's capital stock of CITGO Holding.

60.    Since the swap was announced, ratings agencies have downgraded PDVSA from CCC to CC, and S&P has characterized the swap as a "distressed exchange" that is "tantamount to default."  Fitch Ratings is expected to assign a "CCC/RR4(exp)" rating to PDVSA's proposed bonds, noting that this "suggests a real possibility of default."

61.    *Financial Times* ("FT") has reported that this pledge of CITGO Assets as collateral could have severe consequences:  "PDVSA's proposed debt swap is also complicated by the proposal to offer up to 50.1 per cent of Citgo as security for bondholders who agree to the deal. Firstly, it is already the state oil company's main seizable asset in case of a default; secondly, if it is fully pledged to underpin the bond swap then it would in practice deprive other bondholders of their main security."  FT further reported:  "Lawyers say this would therefore probably fall foul of the 'negative pledge' clause in PDVSA's existing bonds. Tellingly, the 442 pages of documentation on the debt swap lists no law firms or investment banks involved."  FT wrote:  "This is a worrying sign, in that no counsel for PDVSA, no counsel for Citgo, no counsel for the bondholders, no counsel for Venezuela and no counsel for any of the collateral, paying,

trustees is putting their name on this document,' Russ Dallen of Caracas Capital wrote in a note."

FT continued: "Even if enough bondholders sign up, and the legality of the collateral pledge goes unchallenged, Citgo may prove scant security. If PDVSA defaults on the new bonds then investors can seize 50.1 per cent of the US petrol company, but this would trigger a 'change-of-control' clause in Citgo's own $5bn of debt, making it immediately payable."

62.     This most recent transaction is a continuation of Venezuela and PDVSA's campaign to liquidate, expatriate, encumber and/or shield its United States assets so that they cannot be seized by Venezuela and PDVSA's many judgment creditors.

### A Creditor of Venezuela is a Creditor of PDVSA

63.     Plaintiffs ConocoPetrozuata, ConocoHamaca and ConocoGulf are direct creditors of Venezuela in relation to the ICSID claims.   Plaintiffs ConocoPetrozuata and ConocoVenezuela are direct creditors of PDVSA in relation to the ICC Arbitrations.   For purposes of this action, all Plaintiffs are creditors of both Venezuela and PDVSA because PDVSA is now the alter ego of Venezuela.

64.     The government of Venezuela today exercises complete control over PDVSA, and uses the company as a tool to implement government policy initiatives without regard to the interests of PDVSA as a petroleum company.

65.     PDVSA serves as the primary source of funds for Venezuela and Venezuela uses PDVSA's assets as its own.  Current President Nicolás Maduro has explained that PDVSA is a "central pillar of economic stability" in Venezuela.

66.     Venezuela sets oil prices and prescribes how PDVSA conducts its business, including in relation to how it borrows money or to whom it may sell oil.  There is substantial

overlap in the ranks of the government of Venezuela and the senior positions at PDVSA. Venezuela uses PDVSA to serve its political and social ends.

67. Venezuela established PDVSA by presidential decree and its relationship to the government is established by the country's constitution. Following the nationalization of the Venezuelan oil industry in 1975, the then-president decreed PDVSA's incorporation. The company's Articles of Incorporation note that PDVSA is "a state company" in which the government retains control over the "supreme direction and management of the company." Article 303 of Venezuela's current constitution, adopted in 1999, provides that: "For reasons of economic and political sovereignty and national strategy, the State shall retain all shares of Petróleos de Venezuela, S.A."

68. Venezuela runs PDVSA on a daily basis. In PDVSA's debt offerings and SEC filings, the company admits that "[t]he National Executive . . . regulates and supervises our operations." The government appoints individuals to serve in the senior positions of PDVSA, and senior officers in the company often have overlapping roles within the Venezuelan government.

69. For example, Eulogio del Pino serves concurrently as president of PDVSA and CITGO Holding and as Minister of Petroleum of Venezuela. The Ministry of Petroleum shares an office building with PDVSA in Caracas.

70. Venezuela hires and fires PDVSA personnel and establishes oil prices, production and sales. Venezuela treats PDVSA's assets as indistinguishable from its own. For example, the Venezuelan government uses PDVSA's aircraft in service of the government's domestic and foreign political objectives. Venezuela used PDVSA's assets and personnel to provide and

maintain public housing and infrastructure, as well as to further the state's foreign policy interests.

71.     Indeed, the 2015 bond offering materials make clear that PDVSA is "100% owned and controlled" by Venezuela, and identifies as a "risk factor" to investors the fact that "[m]ajor corporate actions of PDVSA may be subject to the approval of the Venezuelan government, as its sole shareholder."  The offering materials further concede that creditors of Venezuela might successfully seek to "pierc[e] the corporate veil of PDVSA."

72.     PDVSA now holds the assets that Venezuela expropriated from the Plaintiffs. PDVSA received the Plaintiffs' interests in major projects in the Orinoco Oil Belt worth tens of billions of dollars, which Plaintiffs developed through over a decade of investment, expertise and resources.  PDVSA is now the holder too, of more than US $2.8 billion dollars that could have satisfied the Plaintiffs' claims in the United States.

**Count I:  Fraudulent Transfer (Actual Intent)**

73.     The above paragraphs are incorporated as if fully set forth herein.

74.     DUFTA provides that a transfer is "fraudulent" if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor, 6 *Del. C.* § 1304(a)(1). In determining such actual intent, courts look to the non-exclusive badges of fraud set forth in the statute, *see id.* § 1304(b), and other considerations.

75.     Prior to and during the course of Plaintiffs' arbitral proceedings against PDVSA and Venezuela, PDVSA and Venezuela knew and anticipated that Plaintiffs (and other actual or potential creditors whose interests Venezuela expropriated) would obtain arbitral awards against PDVSA and/or Venezuela.

76.     In response, Defendants first attempted to liquidate CITGO and move the proceeds out of the U.S.  When that failed, Defendants caused CITGO Holding to raise $2.8 billion in debt and execute a series of transactions that expatriated those proceeds offshore as "dividends" from CITGO Holding to PDV Holding to PDVSA.  PDVSA then took further actions to expatriate its assets to Venezuela and shield those assets from creditors such as Plaintiffs.

77.     Those transactions bear numerous badges of fraud, as discussed further above, including but not limited to:

i.  PDVSA, PDV Holding, Inc. and CITGO are all interconnected, 100% owned corporate affiliates with overlapping officers, boards of directors and personnel and are thus "insiders."

ii.  PDVSA has engaged in a series of actions to liquidate and expatriate its assets from the United States to Venezuela, including an unsuccessful attempt to sell CITGO in 2014.

iii.  Former President Hugo Chávez has stated that expropriation claimants such as Exxon and ConocoPhillips "are trying the impossible: to get us to pay them . . . We are not going to pay them anything."

iv.  Other Venezuela government officials have reportedly stated, among other things, that the "decision to sell Citgo [was] also motivated by concerns in Caracas that two arbitration panels at the World Bank's International Center for Settlement of Investment Disputes (ICSID) likely will issue rulings soon ordering [PDVSA] to compensate ConocoPhillips and Exxon Mobil for their stakes in Venezuelan integrated Orinoco assets that were nationalized in 2007."

v.  PDVSA liquidated and extracted US $2.8 billion from the United States via a complicated bond offering in February 2015.  Those funds are now located in Venezuela, beyond the reach of judgment creditors, and CITGO is heavily encumbered as a result.

vi.  Before causing the transfer through the "dividend" payments, Venezuela and PDVSA had either already been sued or threatened with suits predicted to result in billions of dollars in arbitral awards against it.  In addition, Venezuela publicly recognized that its CITGO assets would be the primary targets for the enforcement of any unpaid arbitral awards.

vii.   By moving value from its U.S. subsidiaries to itself in Venezuela, PDVSA retained control of the transferred debt proceeds but moved them to a jurisdiction where they would be beyond the reach of its many judgment creditors.

viii.   PDVSA has used—and is using—CITGO as its procurement and payment agent without providing compensation to CITGO.  PDVSA has not respected corporate formalities and uses CITGO as its tool when it sees fit.

ix.   Most recently, PDVSA has caused CITGO to pay commercial debts on its behalf.

x.   PDVSA has also used CITGO as a procurement and payment agent on numerous purchases of everything from airplanes to power generators and spare mechanical parts for vessels, without paying compensation to CITGO.

xi.   PDVSA has initiated debt swaps in September 2016 that will further encumber CITGO by pledging its indirect holding of 50.1% of CITGO's stock as collateral to the transaction.

78.   Each of the Plaintiffs has a "claim" in the form of their respective ICC arbitration claims and/or ICSID arbitration claims and/or awards and is a creditor within the meaning of DUFTA § 1305.

79.   One or more of the transactions as described above was or may be completed by one or more of the Defendants with the intent to hinder, delay or defraud one or more of the Plaintiffs.

### Count II:  Fraudulent Transfer (Constructive Fraudulent Transfer)

80.   The above paragraphs are incorporated as if fully set forth herein.

81.   DUFTA provides that a transfer is "fraudulent" if a debtor makes a transfer "[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation," and the debtor either "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" or "[i]ntended to incur, or believed or reasonably should have believed that the

debtor would incur, debts beyond the debtor's ability to pay as they became due."  6 *Del. C.* § 1304(a)(2).

82.    In the alternative, and to the extent that the described transactions have any legitimate non-fraudulent purpose behind them (which they do not), CITGO, PDVSA and Venezuela together engaged in a series of transfers that, if not actually fraudulent, were constructively fraudulent.

83.    For example, upon information and belief, PDVSA transferred US $2.8 billion—the proceeds it extracted from the United States in the February 2015 bond transaction—to the government of Venezuela.   Upon information and belief, PDVSA did not receive any consideration in return.

84.    PDVSA passed these proceeds to Venezuela at a time when it intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.  PDVSA's use of CITGO as its procurement and payment agent to pay off PDVSA's commercial debts evidences PDVSA's own inability to pay these debts as they became due.  PDVSA has since then reportedly caused CITGO to begin paying commercial debts due to BP, as *Reuters* reporters state they had access to copies of "bank transfer vouchers" in relation to payments by CITGO to BP on at least two PDVSA invoices totaling US $43.7 million.

85.    Further, to the extent that the 2016 bond swap transaction has any legitimate non-fraudulent purpose behind it (which it does not), it demonstrates PDVSA's inability to meet its bond obligations as they become due, thus necessitating an attempt to postpone the maturity dates.  Indeed, upon issuance of the later 2016 bond swap, Standard & Poor's has characterized the swap on offer as a "distressed exchange" that would be "tantamount to default."

## **Prayer**

86.    DUFTA provides for remedies including, among others, the avoidance of transfers or obligations, injunctions against further disposition, and the appointment of a receiver to take charge of assets transferred.

87.    Plaintiffs therefore respectfully request that this Court: (a) declare one or more of the transactions described above as fraudulent as to one or more of the Plaintiffs pursuant to DUFTA; (b) direct the Defendants, as may be applicable, to return any assets fraudulently transferred; (c) award money damages as may be available; (d) invalidate any security interests or other obligations as may be appropriate; (e) enjoin the Defendants from further disposing of assets; and (f) order such other and further legal and/or equitable relief as may be just and proper.

Respectfully submitted,

ROSS ARONSTAM & MORITZ LLP

*Of Counsel*:

Michael S. Kim
Carrie A. Tendler
Marcus J. Green
Michael A. Sanfilippo
KOBRE & KIM LLP
800 Third Avenue
New York, NY  10022
(212) 488-1200
michael.kim@kobrekim.com
carrie.tendler@kobrekim.com
marcus.green@kobrekim.com
michael.sanfilippo@kobrekim.com

*/s/ Garrett B. Moritz*
Garrett B. Moritz (#5646)
Benjamin J. Schladweiler (#4601)
100 S. West Street, Suite 400
Wilmington, DE  19801
(302) 576-1600
gmoritz@ramllp.com
bschladweiler@ramllp.com

*Counsel for Plaintiffs ConocoPhillips Petrozuata B.V., Phillips Petroleum Company Venezuela Limited, ConocoPhillips Gulf of Paria B.V., and ConocoPhillips Hamaca B.V.*

Dated:  October 6, 2016